IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

APR 30 2015

ARTHUR JOHNSTON
BY_____ DEPUTY

| | |
|---|---|
| ITRON, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 3:15cv 330 TSL-RHW |
| STEPHEN D. JOHNSTON, AJIT HABBU, and GARY KESSLER, | JURY TRIAL DEMANDED |
| Defendants. | |

## ORIGINAL COMPLAINT
## JURY TRIAL DEMANDED

Plaintiff Itron, Inc. ("Itron"), by its undersigned counsel, files this Original Complaint asserting claims for negligent misrepresentation against Stephen D. Johnston, Ajit Habbu, and Gary Kessler (collectively, "Defendants"), and in support of its claims, states as follows:

### PARTIES

1.      Plaintiff Itron is a corporation organized under the laws of Washington, with its principal place of business in Liberty Lake, Washington. Itron files this lawsuit in its own capacity, asserting causes of action that originally accrued to Itron itself. Itron does not file this lawsuit in its capacity as successor to SmartSynch, Inc. ("SmartSynch"), and is not asserting herein any cause of action that may have originally accrued to SmartSynch.

2.      On information and belief, Stephen D. Johnston is a natural person residing at 17 Sheffield Court, Jackson, MS 39211. Mr. Johnston joined SmartSynch in or about May of 2000, and became its CEO in 2004. He remained CEO of SmartSynch until it merged with Itron on or about May 1, 2012.

3.       On information and belief, Ajit Habbu is a natural person residing at 222 Karen Avenue, Apt. 4307, Las Vegas, Nevada 89109. Mr. Habbu was employed as the CFO of SmartSynch from March 2010 until SmartSynch merged with Itron on or about May 1, 2012.

4.       On information and belief, Gary Kessler is a natural person residing at 4908 Cedar Street, Flower Mound, TX 75028. Mr. Kessler was employed as Vice President of Product Marketing at SmartSynch from October 2011 until it merged with Itron on or about May 1, 2012.

## JURISDICTION AND VENUE

5.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity between the adverse parties (i.e. Itron is a citizen of a different state than any of the Defendants), and the amount in controversy (exclusive of interests and costs) far exceeds the sum of $75,000.00. Itron contends that its damages to be proved at trial will exceed at least the amount of Eighteen Million Dollars ($18,000,000).

6.       This Court has personal jurisdiction over each Defendant. The acts and omissions of each Defendant giving rise to the causes of action asserted herein occurred exclusively or primarily within the State of Mississippi. Defendant Johnston and Defendant Habbu lived and worked in Mississippi at all times relevant to this case. All Defendants were employed by a Mississippi company (SmartSynch) and directed all or a substantial part of their work activities toward Mississippi at all times relevant to this case; and the specific wrongful acts of each Defendant alleged herein are related to the merger and acquisition of SmartSynch, which was substantially located in Mississippi. The Court's exercise of personal jurisdiction over each Defendant in this case is consistent with the requirements of due process; and each Defendant can be served with process under the relevant federal and/or Mississippi rules regarding service of process.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the Southern District of Mississippi. Upon information and belief, all acts or omissions committed by Defendants alleged herein occurred in or were directed to the Southern District of Mississippi.

## BACKGROUND

8.      SmartSynch, Inc. was a Jackson, MS technology company in the business of providing smart-grid solutions for wireless connections between devices, such as smart electricity meters. SmartSynch partnered with Itron on various projects going back to at least 2004. SmartSynch was acquired by Itron in 2012 for cash and other consideration valued at approximately $100 million.

9.      In 2012, Consert, Inc. ("Consert") was a San Antonio, Texas software company specializing in software for smart electric meters and other wireless devices. SmartSynch and Consert entered into a new Development Supply and Commercialization Agreement ("Consert Agreement") on or about April 25, 2012—just one week prior to the closing of SmartSynch's merger with Itron. Itron inherited the new Consert Agreement upon its acquisition of SmartSynch. On information and belief, Consert was purchased by Toshiba Corp. in 2013.

### SUMMARY OF THE DISPUTE

10.      Itron files this lawsuit against SmartSynch's former CEO, CFO and Vice President of Product Marketing. These individuals were negligent in the performance of their duties during the days leading up to Itron's acquisition of SmartSych and the closing of the merger. Their negligence resulted in the Consert Agreement—a contract that should never have

3

been signed. Their negligence also resulted in misrepresentations and omissions to Itron, causing Itron to unknowingly take on SmartSynch's bad contract.

11.     The Consert Agreement quickly resulted in litigation between Itron (in its capacity as successor-in-interest to SmartSynch) and Consert, with Consert claiming at least $60 million in damages for breach of contract. A lawsuit was filed in Delaware in July, 2012; just prior to trial, in or about February 2015, Itron settled the case by agreeing to pay Consert a substantial cash payment.

12.     Itron files this lawsuit against certain former officers and employee of SmartSynch who were responsible for making negligent misrepresentations and/or negligent omissions to Itron that directly caused Itron certain losses and damages in connection with the Consert Agreement and associated litigation, as described more particularly below.

### THE MERGER AGREEMENT—ITRON AGREES TO ACQUIRE SMARTSYNCH

13.     On March 30, 2012, Itron agreed to acquire SmartSynch pursuant to an Amended and Restated Merger Agreement by and among Itron, Grizzly Merger Sub, Inc. ("Merger Sub", a wholly-owned subsidiary of Itron), SmartSynch and Kinetic Ventures, LLC ("Merger Agreement"). The Merger Agreement is attached as **Exhibit A**.

14.     In the Merger Agreement, SmartSynch made various representations and warranties related to the status of its business and various covenants related to the conduct of its ongoing business during the period of time between the execution of the Merger Agreement on March 30, 2012 and the consummation of the transactions contemplated by the Merger Agreement ("Closing") that would take place on May 1, 2012 ("Closing Date"). These requirements were designed to ensure that those disclosures remained accurate and that SmartSynch's value would not unduly change before the Closing Date.

15.    Among other things, the Merger Agreement required that SmartSynch disclose all its "Material Contracts." *See* Merger Agreement § 4.21. The Merger Agreement also required that SmartSynch refrain from entering into certain Material Contracts or taking other similar actions without the prior written consent of Itron. *See e.g.,* Merger Agreement §§ 6.1, 6.2(e, h, j, bb, gg).

16.    Under the terms of the Merger Agreement, "Material Contracts" include at least the following, as set forth in Section 4.21(a) of the Merger Agreement:

- (xiv) any Contract relating in whole or in part to any Intellectual Property, other than customer license agreements entered into in the ordinary course of business consistent with past practice;

- (xix) any Contract for the purchase or sale of any commodity, product, material, supplies, equipment or personal property for a price in excess of $100,000, other than purchase or sale orders entered into in the ordinary course of business, consistent with past practice;

- (xx) any Contract under which [SmartSynch] has agreed or committed to make a capital expenditure or to purchase a capital asset in excess of $100,000, individually by or on behalf of [SmartSynch]; [and]

- (xxiv) any Contract or series of related Contracts with the same counterparty or its affiliates which: (A) requires aggregate future expenditures by [SmartSynch] in excess of $100,000 individually or $200,000 in the aggregate and which [SmartSynch] does not have the right to terminate without penalty on less than 30 days' notice; or (B) is material to the business, operations, assets, financial condition, results of operations or prospects of [SmartSynch] and [SmartSynch] Subsidiaries, taken as a whole.

17.    The Merger Agreement required SmartSynch to fully disclose, and deliver or make available to Itron, each of its Material Contracts. *See* Merger Agreement § 4.21(a, b). Once SmartSynch entered into the Consert Agreement, the Merger Agreement required SmartSynch to fully disclose that fact to Itron. *See* Merger Agreement § 7.4.

18.    The Merger Agreement conditioned Itron's obligation to consummate the transactions contemplated by the Merger on (1) at least the material truth of SmartSynch's

representations and warranties, in the Merger Agreement and all ancillary agreements and schedules, when made and as of the Closing Date; (2) SmartSynch's compliance with all covenants in the Merger Agreement and any ancillary agreements; and (3) SmartSynch's performance of all of its obligations at or prior to Closing. *See* Merger Agreement § 9.3(a).

19.     The Merger Agreement also contained negotiated provisions requiring the Chief Executive Officer or Chief Financial Officer to certify that, as of the time the Merger became effective: (1) SmartSynch had not experienced any change that was likely to have a material adverse effect on SmartSynch; (2) SmartSynch's representations and warranties contained in the Merger Agreement and its schedules remained true; and (3) SmartSynch had fully performed all obligations and agreements, and complied with all covenants and conditions to the Merger Agreement. *See* Merger Agreement §§ 9.3(a, b, k), 9.4(a).

20.     The Merger Agreement also conditioned Itron's obligation to close on the receipt of other documents from the officers of SmartSynch, including, *inter alia*: (1) a statement certifying certain corporate records were accurate and confirming the authority of signatories to the Merger Agreement; (2) an affidavit certifying that SmartSynch had complied with certain securities and/or corporate governance regulations; and (3) letters of resignation from members of the Board of Directors and certain officers of SmartSynch. *See* Merger Agreement §§ 9.3(k), 9.4(a, d-e, i).

21.     To ensure that the certifications of the officers provided a meaningful source of protection to Itron in the event of their liability for errors in the performance of their duties under the Merger Agreement, the Merger Agreement required SmartSynch to warrant that it had taken steps to ensure that its officers were in a position to compensate Itron for any harm resulting from such errors. *See* Merger Agreement § 4.23.

### THE CONSERT AGREEMENT

22.      On or about April 25, 2012—just six days before the scheduled Merger between Itron and SmartSynch—Consert and SmartSynch entered into the Consert Agreement. Mr. Habbu executed the Consert Agreement by signing on behalf of SmartSynch on or about April 24, 2012, and Consert counter-signed the agreement the following day, April 25, 2012. The Consert Agreement is attached hereto as **Exhibit B**.

23.      The Consert Agreement was a Material Contract under the Merger Agreement, falling under at least the following provisions defining a Material Contact under the Merger Agreement: Sections 4.21(a)(xiv), (xix), (xx), and (xxiv).

24.      Based on at least the foregoing contractual provisions, SmartSynch was obligated to obtain Itron's prior written approval before entering into the Consert Agreement.

25.      Based on at least the foregoing contractual provisions, SmartSynch was obligated to disclose the Consert Agreement to Itron prior to the closing of the merger.

26.      In or around 2010, SmartSynch and Consert had entered into preliminary discussions regarding a potential joint venture between the companies. Negotiations continued through 2011 and into 2012.

27.      The Consert Agreement facially required SmartSynch to pursue a venture with Consert whereby the parties would jointly develop a product or set of products—described as a "Solution"—sharing in the expenses and burden of such a venture and the rights and profits thereto. The Consert Agreement thus constitutes an entry into a joint venture, strategic alliance, exclusive dealing, noncompetition, or similar contract or arrangement. SmartSynch was obliged to refrain from entering into such an agreement pursuant to at least Section 6.2(e) of the Merger Agreement unless authorized in writing by Itron to do so.

7

28.     The Consert Agreement facially required SmartSynch to purchase a minimum of 50,000 licenses per calendar quarter during the first five years of the Agreement at a rate of at least $60 per license, with a $3 million payment for the first 50,000 licenses due upon execution. The effect of this provision was to oblige SmartSynch to make at least $60,000,000 in license payments over five years. The Consert Agreement thus constitutes the authorization, or making, or committing to make of a commitment with respect to a single (and aggregate) capital expenditure in excess of $200,000. SmartSynch was obliged to refrain from entering into such an agreement pursuant to at least Section 6.2(j) of the Merger Agreement unless authorized in writing by Itron to do so.

29.     The Consert Agreement facially granted Consert a limited intellectual property license to use and copy SmartSynch's intellectual property, and thus constitutes an act by SmartSynch to lease, license, pledge, or encumber its Intellectual Property. SmartSynch was obliged to refrain from entering into such an agreement pursuant to Section 6.2(bb) of the Merger Agreement unless authorized in writing by Itron to do so.

30.     The Consert Agreement facially required the quarterly purchase of licenses over a period of five years, and thus constituted a continuing sales or purchase, sales promotion, market research, marketing, consulting or advertising Contract could not be cancelled by Itron without penalty on notice of 30 days or fewer that SmartSynch was obliged to disclose to Itron as a Material Contract pursuant to Section 4.21(a)(i) and Section 7.4 of the Merger Agreement.

31.     The Consert Agreement facially required SmartSynch to pay for a minimum of 50,000 licenses per year whether or not sufficient products to require such licenses were ultimately sold to customers, and thus constituted a "take-or-pay" contract that SmartSynch was

obliged to disclose to Itron as a Material Contract pursuant to Section 4.21(a)(iii) and Section 7.4 of the Merger Agreement.

32.     The Consert Agreement facially granted and took licenses, and promised to pay for the taking of future licenses, to intellectual property. The Consert Agreement also granted Consert rights to future intellectual property jointly developed between Itron and SmartSynch. The Consert Agreement thus constituted a contract related in part to Intellectual Property that SmartSynch was obliged to disclose to Itron as a Material Contract pursuant to Section 4.21(a)(xiv) and Section 7.4 of the Merger Agreement.

33.     The Consert Agreement facially required an initial pre-purchase commitment of $3,000,000, and subsequent pre-purchase or purchase commitments of $3,000,000 per quarter, and thus constitutes (1) a contract for the purchase or sale of a product, equipment, or personal property in excess of $100,000; (2) a capital expenditure or purchase of a capital asset in excess of $100,000; and (3) a contract requiring aggregate future expenditures in excess of $100,000 that is material to the financial condition of SmartSynch. The Consert Agreement thus constituted a Material Contract that SmartSynch was obliged to disclose to Itron pursuant to Section 4.21(a)(xix-xx, xxiv) and Section 7.4 of the Merger Agreement.

34.     On information and belief, the Consert Agreement was a rare or unique occurrence in SmartSynch's business practice. SmartSynch had only entered into two agreements of comparable size previously. At the time of the Merger Agreement, the normal business practice of SmartSynch was to refuse to commit to make significant up-front capital expenditures in agreements or partnerships of this type. It was also SmartSynch's normal practice to involve its Board of Directors in the decision to execute contracts in excess of $250,000 in committed expenditures.

35.     The Consert Agreement was not executed in the ordinary course of business consistent with SmartSynch's past practices.

36.     SmartSynch's entry into a new Material Contract involving a financial commitment of $60,000,000 (1) was likely to have an adverse effect on the financial status of SmartSynch and (2) made Section 4.21 of the Company Disclosure Schedule materially untrue at the time of the Closing. SmartSynch was obliged to refrain from entering into such an agreement pursuant to Section 6.2(h) and Section 6.2(gg) of the Merger Agreement unless authorized by Itron in writing to enter into that agreement. SmartSynch was obliged to inform Itron that it had entered into such an agreement under Section 7.4 of the Merger Agreement.

37.     SmartSynch executed the Consert Agreement without obtaining Itron's prior approval, as required by the Merger Agreement.

38.     At no time did Itron authorize SmartSynch to enter into an agreement with Consert.

39.     At no time prior to the Closing Date did SmartSynch (or any employee of SmartSynch, including the Defendants) disclose to Itron that SmartSynch had entered into the Consert Agreement.

### THE MERGER

40.     On May 1, 2012, Itron acquired SmartSynch through a merger, whereby SmartSynch was ultimately merged into Itron, with Itron being the surviving corporation and the successor-in-interest to SmartSynch.

41.     In conjunction with this merger, Stephen D. Johnston, Ajit Habbu, and Gary Kessler, individually and/or in concert, signed, delivered, and/or caused to be delivered one or

10

more documents required to obligate Itron to consummate the Merger. These documents include, but are not limited to:

- A Company Officer's Certificate, attached hereto as **Exhibit C**
- A Secretary's Certificate, attached hereto as **Exhibit D**
- Officer and Director Resignations, attached hereto as **Exhibit E**
- A Preliminary Closing Statement, including a consolidated balance sheet purporting to be current as of April 30, 2012, attached hereto as **Exhibit F**
- Other documents purporting to represent the then-current legal and financial condition of SmartSynch.

42.    At no time during or before the Closing of the Merger did any representative of SmartSynch, including any of the named Defendants: (1) inform Itron that SmartSynch had signed any contract or reached any agreement, much less a Material Agreement, with Consert; (2) inform Itron that SmartSynch owed Consert any money pursuant to an agreement with Consert; or (3) deliver to Itron an executed agreement between SmartSynch and Consert.

43.    At the time the merger closed, Itron was not aware that SmartSynch had entered into the Consert Agreement.

44.    If SmartSynch or any of its officers or employees had followed the requirements of the Merger Agreement to obtain Itron's prior approval of the Consert Agreement, Itron would not have provided approval, and the Consert Agreement would not have been executed.

45.    If SmartSynch or any of its officers or employees had followed the requirements of the Merger Agreement to notify Itron of the existence and nature of the Consert Agreement, Itron would not have closed the Merger on the financial terms set forth in the Merger Agreement, and would have insisted on an adjustment to the terms of the Merger, or would have taken other actions to address the Consert Agreement prior to closing the merger.

46.    As a result of the Merger Agreement, Itron inherited SmartSynch's obligations to Consert under the Consert Agreement.

47.     On or about June 30, 2012, Itron, in its capacity as successor-in-interest to SmartSynch, received an invoice from Consert pursuant to the Consert Agreement. Upon receiving this invoice, Itron promptly investigated and discovered the Consert Agreement, including the provisions of the Consert Agreement that satisfy the definition of "Material Contract" under the Merger Agreement.

48.     The Consert Agreement quickly resulted in litigation between Itron (in its capacity as successor-in-interest to SmartSynch) and Consert. The litigation was styled *Itron, Inc., as successor-in-interest to SmartSynch, Inc., v. Consert Inc.*, Case No. 7720-VCL, in the Chancery Court of the State of Delaware (hereinafter the "Consert Litigation").

49.     On July 25, 2012, Itron initiated the Consert Litigation by filing a Complaint against Consert, asserting claims for declaratory judgment seeking to void the Consert Agreement. Itron also asserted a claim, in the alternative, to reform the Consert Agreement. Itron also asserted related tort causes of action. In the Consert Litigation, Consert asserted counterclaims for breach of the Consert Agreement and related causes of action.

50.     On February 2, 2015, just prior to trial, Itron and Consert settled the claims asserted in the Consert Litigation pursuant to a Settlement Agreement and Release. As consideration for Consert's release of claims against Itron under the Consert Agreement, Itron paid Consert a substantial cash payment.

## COUNT I

### NEGLIGENT MISREPRESENTATION AGAINST STEPHEN D. JOHNSTON

51.     Itron incorporates herein the allegations of paragraphs 1 through 50 above.

52.     In the course of his business, profession, or employment, Defendant Johnston made material statements of fact to Itron that were untrue, and failed to provide material facts he

had a duty to provide. Mr. Johnston failed to exercise ordinary care in his collection of material information and failed to exercise ordinary care in relaying that information to Itron. Itron relied upon Mr. Johnston's misrepresentations and omissions, and Itron's reliance was reasonable. These misrepresentations and omissions caused material harm to Itron, as alleged more specifically below.

53.     On or about May 1, 2012, at the time of Itron's merger with SmartSynch, Defendant Johnston signed an Officer's Certificate in his capacity as CEO of SmartSynch. The Officers Certificate was delivered to Itron along with the all the closing documents, at the merger closing.

54.     The Officer's Certificate signed by Mr. Johnston certified, in relevant part, that "Each of the representations and warranties of [SmartSynch] contained in the Merger Agreement or any Ancillary Agreement or any schedule, certificate or other document delivered pursuant hereto or thereto or in connection with the transactions contemplated hereby or thereby were and are true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Material Adverse Effect, which representations and warranties shall be true and correct in all respects) both when made and as of the date hereof . . . . The Company [SmartSynch] has performed all obligations and agreements and complied with all covenants and conditions required by the Merger Agreement or any Ancillary Agreement to be performed or complied with it prior to or at the closing."

55.     The above-quoted statement in the Officer's Certificate was not true at the time it was signed, and was not true at the time it was delivered to Itron. In particular, the above statement was not true in light of the Consert Agreement, which had been executed one week

prior to the merger without Itron's written consent, and which had not been disclosed to Itron as a Material Contract under the Merger Agreement.

56.     The Officer's Certificate signed by Mr. Johnston certified, in relevant part, that "There has not occurred any change, event or development that, individually or in the aggregate, has had or is reasonably likely to have a Material Adverse Effect."

57.     The above-quoted statement in the Officer's Certificate was not true at the time it was signed, and was not true at the time it was delivered to Itron. In particular, the above statement was not true in light of the Consert Agreement, which had been executed one week prior to the merger without Itron's written consent, and which had not been disclosed to Itron as a Material Contract under the Merger Agreement.

58.     Mr. Johnston was under a legal duty to provide truthful and accurate information regarding SmartSynch's business to Itron in the days leading up to the merger. The Merger Agreement itself imposes this duty through the delivery of an Officer's Certificate in Section 9.4(a) of the Merger Agreement. As the party responsible for executing the Officer's Certificate, Mr. Johnston had a duty to verify the accuracy and completeness of the information contained therein. Mr. Johnston therefore reasonably should have known of any material change in the condition of SmartSynch, or SmartSynch's obligations, and in particular should have known of the existence of (and substantial financial commitment contemplated by) the Consert Agreement. Mr. Johnston reasonably should have known of any Material Adverse Effect to SmartSynch.

59.     Mr. Johnston failed to exercise ordinary care in his representations to Itron with respect to his execution of the Officer's Certificate in light of the Consert Agreement. Mr. Johnston's negligent acts include at least: failing to read the Consert Agreement and other documents about which he made representations inducing Itron to close the Merger; failing to

make a reasonable inquiry into the factual basis of the representations he was making in the Officer's Certificate; failing to involve himself in the approval and execution of the Consert Agreement; and failing to exhibit the ordinary level of care with respect to his execution and delivery of the Officer's Certificate.

60.     The delivery of an Officer's Certificate under Section 9.4(a) of the Merger Agreement was a bargained-for condition obliging the certifying officer to truthfully convey certain information that Itron could not as a practical matter verify for itself, and Itron was reasonable to rely on the truthfulness of the representations contained therein. The Officer's Certificate is intended in part to give Itron a cause of action for negligent misrepresentation in the event that the representations contained within it turn out to be untrue.

61.     Itron in fact relied on the statements contained within the Officer's Certificate. Specifically, Itron relied upon the Officer's Certificate as a condition to closing without seeking adjustment to the Merger Consideration or taking other corrective action regarding the Consert Agreement prior to the closing of the merger.

62.     Itron's reliance on the statements contained in the Officer's Certificate was reasonable. Defendant Johnston and Defendant Habbu were in the best position to know the details of SmartSynch's business prior to closing, and Itron was unaware of any reason to doubt the accuracy of their representations. It is customary in the relevant industry to accept at face value an officer's certification that previous representations remain true and that covenants and conditions of a merger have been complied with.

63.     Itron's obligation to consummate the Merger was conditioned upon the delivery of the Officer's Certificate confirming that SmartSynch had complied with all covenants,

reaffirming the truth of all representations and warranties, and certifying that no intervening event had given rise to a Material Adverse Effect.

64.     But for the delivery of the Officer's Certificate certifying that SmartSynch had complied with all covenants and that applicable representations and warranties remained true in all material respects, Itron would not have consummated the Merger with SmartSynch under the terms as stated in the Merger Agreement. As a direct and proximate result of Defendant Johnston's negligent misrepresentations, Itron lost the opportunity to seek an adjustment of the Merger Consideration, or to seek a cancellation of (or otherwise address) the Consert Agreement prior to the Merger Closing.

65.     In addition to executing the Officer's Certificate, Mr. Johnston played an active role in coordinating with Itron in preparation for the merger. Mr. Johnston represented SmartSynch to Itron. Mr. Johnston repeatedly communicated with decision-makers at Itron with respect to the actions undertaken by SmartSynch in preparation for its Merger with Itron. Mr. Johnston regularly made representations and provided updates with respect to the status of SmartSynch as it related to the Merger Agreement. In the course of these representations, Mr. Johnston unknowingly relayed false, incomplete, and/or misleading information that gave rise to a duty to correct those statements by providing truthful information.

66.     On or after April 25, 2012 and on or before May 1, 2012—prior to the consummation of the Merger Agreement and merging of SmartSynch into Itron, and after he should have obtained knowledge of the existence and terms of the Consert Agreement—Stephen D. Johnston created, executed, or delivered (or caused to be created, executed or delivered) documents required for Itron to be obliged to consummate the Merger.

67.     At no time prior to the merger on May 1, 2012 did Defendant Johnston ever seek Itron's approval to execute the Consert Agreement.

68.     At no time prior to the merger on May 1, 2012 did Defendant Johnston notify anyone at Itron about the existence of the Consert Agreement, or that it had been executed by SmartSynch.

69.     Mr. Johnston's duties as CEO of SmartSynch were such that he reasonably should have been informed of the existence and material terms of the Consert Agreement. In particular, Mr. Johnston was aware of Mr. Kessler's active negotiation toward an agreement with Consert, that Mr. Kessler was negotiating price terms with Consert, and that the Merger Agreement prohibited entering into agreements with substantial financial commitments. For at least the preceding reasons, Mr. Johnston was on notice that he had a duty to inquire personally into the nature of any agreement with Consert.

70.     The normal course of business required that Mr. Johnston exercise ordinary care by personally involving himself, and the Board of Directors of SmartSynch, in contract negotiations similar to those surrounding the Consert Agreement. Mr. Johnston was obliged to determine whether or not any contract negotiation required his involvement. Conducting such an inquiry would have revealed the terms of the SmartSynch agreement.

71.     Mr. Johnston bears responsibility for any failures of his subordinates to inform him of the existence and material terms of the Consert Agreement prior to consummation of SmartSynch's Merger with Itron.

72.     Mr. Johnston negligently breached his duty to discover and relay accurate information regarding the Consert Agreement. Mr. Johnston's negligent acts include at least: failing to make a reasonable inquiry into the accuracy of the representations within the Officer's

Certificate; failing to supervise his subordinates adequately; failing to inform Itron that SmartSynch had entered into the Consert Agreement; failing to correct misstatements he made to Itron; and failing to involve himself in the approval and execution of the Consert Agreement.

73.     Mr. Johnston's role in the merger process was such that Mr. Johnston was obliged to discover the existence and material terms of the Consert Agreement and to inform Itron of the same. Itron was entitled to rely on Mr. Johnston's non-negligent performance of that role, and thus to rely on the accuracy and completeness of his statements.

74.     But for Mr. Johnston's failure to disclose the nature and existence of the Consert Agreement, Itron would not have consummated the Merger with SmartSynch under the terms as stated in the Merger Agreement. As a direct and proximate result of Defendant Johnston's negligent misrepresentations and omissions, Itron lost the opportunity to seek an adjustment of the Merger Consideration, or to seek a cancellation of (or otherwise address) the Consert Agreement prior to the merger.

75.     Instead, Itron closed the merger and unwittingly assumed liability for the Consert Agreement. This resulted in substantial losses to Itron, due to the Consert Litigation and the resulting settlement.

## COUNT II

### NEGLIGENT MISREPRESENTATION AGAINST AJIT HABBU

76.     Itron incorporates herein the allegations of paragraphs 1 through 75 above.

77.     In the course of his business, profession, or employment, Defendant Habbu made material statements of fact to Itron that were untrue, and failed to provide material facts he had a duty to provide. Mr. Habbu failed to exercise ordinary care in his collection of material information and failed to exercise ordinary care in relaying that information to Itron. Itron relied

18

upon Mr. Habbu's misrepresentations and omissions, and Itron's reliance was reasonable. These misrepresentations and omissions caused material harm to Itron, as alleged more specifically below.

78.     Ajit Habbu, in his capacity as CFO, was the only person other than Mr. Johnston who would have been authorized to sign the Officer's Certificate required to close the Merger. Mr. Habbu was in a position to know that the statements being made by Defendant Johnston in the Officer's Certificate were not true, and therefore had a duty to correct them. Mr. Habbu reasonably should have known of any material change in the condition of SmartSynch, or SmartSynch's obligations, and in particular should have known of the existence of and major substantive financial commitment contemplated by the Consert Agreement. Mr. Habbu also reasonably should have known of any Material Adverse Effect to SmartSynch.

79.     The delivery of an Officer's Certificate under Section 9.4(a) of the Merger Agreement was a bargained-for condition obliging the certifying officer to truthfully convey certain information that Itron could not as a practical matter verify for itself, and Itron was entitled to rely on the truthfulness of the representations contained therein. The Officer's Certificate is intended to give Itron a cause of action for negligent misrepresentation in the event that the representations contained within it turn out to be untrue.

80.     The Officer's Certificate contained material misrepresentations with respect to the non-occurrence of any Material Adverse Event and the present truthfulness of SmartSynch's representations and warranties discussed above, which Mr. Habbu negligently permitted to be relayed to Itron and negligently failed to correct.

81.     As the person with more direct knowledge relevant to the statements in the Officer's Certificate, Mr. Habbu had a duty to ensure that the statements contained within the Officer's Certificate were accurate. Mr. Habbu negligently failed in this duty.

82.     The delivery of an Officer's Certificate under Section 9.4(a) of the Merger Agreement was a bargained-for condition obliging the certifying officer to truthfully convey certain information that Itron could not as a practical matter verify for itself, and Itron was entitled to rely on the truthfulness of the representations contained therein. The Officer's Certificate is intended to give Itron a cause of action for negligent misrepresentation in the event that the representations contained within it turn out to be untrue.

83.     Itron relied on the statements contained within the Officer's Certificate. Specifically, Itron relied upon the Officer's Certificate as a condition to closing without seeking adjustment to the Merger Consideration or taking other corrective action regarding the Consert Agreement prior to the closing of the merger.

84.     Itron's reliance on the substantial truth of the statements contained in the Officer's Certificate was reasonable. Defendant Johnston and Defendant Habbu were in the best position to know the details of SmartSynch's business prior to closing, and Itron was unaware of any reason to doubt the accuracy of their representations. It is customary in the relevant industry to accept at face value an officer's certification that previous representations remain true and that covenants and conditions of merger have been complied with.

85.     Itron's obligation to consummate the Merger was conditioned upon the delivery of the Officer's Certificate confirming that SmartSynch had complied with all covenants, reaffirming the truth of all representations and warranties, and certifying that no intervening event had given rise to a Material Adverse Effect.

86.     But for the delivery of the Officer's Certificate certifying that SmartSynch had complied with all covenants and that applicable representations and warranties remained true in all material respects, Itron would not have consummated the Merger with SmartSynch under the terms as stated in the Merger Agreement. As a direct and proximate result of Defendant Johnston's negligent misrepresentations and Mr. Habbu's negligent failure to correct those misrepresentations, Itron lost the opportunity to seek an adjustment of the Merger Consideration, or to seek a cancellation of (or otherwise address) the Consert Agreement prior to the merger.

87.     Mr. Habbu was under a legal duty to provide truthful and accurate information regarding SmartSynch's business to Itron in the days leading up to the merger. Mr. Habbu played an active role in coordinating with Itron in preparation for the merger. Mr. Habbu represented SmartSynch to Itron. Mr. Habbu repeatedly communicated with decision-makers at Itron with respect to the actions undertaken by SmartSynch in preparation for its Merger with Itron. Mr. Habbu regularly made representations and provided updates with respect to the status of SmartSynch as it related to the Merger Agreement, and in particular made material representations with respect to the financial condition and obligations of SmartSynch. Mr. Habbu personally executed and caused to be delivered to Itron the Secretary's Certificate that was a condition to closing the merger. In the course of these representations, Mr. Habbu unknowingly relayed false, incomplete, and/or misleading information that gave rise to a duty to correct those statements by providing truthful information.

88.     Mr. Habbu's involvement in the execution of the Consert Agreement gave rise to a duty to know its contents and accurately disclose those to Itron. In particular, Mr. Habbu made representations to Mr. Johnston with respect to the Consert Agreement, and discussed the Consert Agreement with Mr. Kessler and SmartSynch's legal counsel. Mr. Habbu also signed the

Consert Agreement on SmartSynch's behalf. Mr. Habbu's responsibility for signing the Consert Agreement obliged him to discover the material terms of that agreement prior to signing it.

89.     In particular, Mr. Habbu made one or more misstatements of material fact regarding the nature, existence, or terms of the Consert Agreement to Itron personnel, giving rise to a duty to correct these misstatements and notify Itron of the existence and material terms of the Consert Agreement.

90.     On or after April 25, 2012 and on or before May 1, 2012—prior to the consummation of the Merger Agreement and merging of SmartSynch into Itron, and after he should have obtained knowledge of the existence and terms of the Consert Agreement—Mr. Habbu created, executed, or delivered (or caused to be created, executed or delivered) documents required for Itron to be obliged to consummate the Merger (including the Secretary's Certificate personally executed by him).

91.     At no time prior to the merger on May 1, 2012 did Defendant Habbu ever obtain Itron's approval to execute the Consert Agreement.

92.     At no time prior to the merger on May 1, 2012 did Defendant Habbu notify anyone at Itron that he personally had executed the Consert Agreement on SmartSynch's behalf.

93.     Mr. Habbu's duties as CFO of SmartSynch were such that he reasonably should have been informed of the existence and material terms of the Consert Agreement.

94.     The normal course of business required that Mr. Habbu involve Mr. Johnston and the Board of Directors of SmartSynch in contract negotiations similar to those surrounding the Consert Agreement. Mr. Habbu was obliged to determine whether or not any contract negotiation required this involvement. Conducting such an inquiry would have revealed the terms of the Consert Agreement.

95.     Mr. Habbu negligently breached his duty to discover and relay accurate information to Itron regarding the Consert Agreement. Mr. Habbu's negligent acts include at least failing to read the agreement about which he made representations inducing Itron to close the Merger, failing to inquire into the basis of representations made to him with respect to the agreement, failing to supervise his subordinates adequately, and failing to involve himself in the negotiation of the Consert Agreement.

96.     Mr. Habbu's role in the merger process was such that Mr. Habbu was obliged to discover the existence and material terms of the Consert Agreement and to inform Itron of the same. Itron was entitled to rely on Mr. Habbu's non-negligent performance of that role, and thus to rely on the accuracy and completeness of his statements.

97.     But for Mr. Habbu's failure to disclose the nature and existence of the Consert Agreement, Itron would not have consummated the Merger with SmartSynch under the terms as stated in the Merger Agreement. As a direct and proximate result of Defendant Habbu's negligent misrepresentations and omissions, Itron lost the opportunity to seek an adjustment of the Merger Consideration, or to seek a cancellation of (or otherwise address) the Consert Agreement prior to the Merger Closing.

98.     Instead, Itron closed the merger and unwittingly assumed liability for the Consert Agreement. This resulted in substantial losses to Itron, due to the Consert Litigation and the resulting settlement.

## COUNT III

### NEGLIGENT MISREPRESENTATION AGAINST GARY KESSLER

99.     Itron incorporates herein the allegations of paragraphs 1 through 98 above.

100.    In the course of his business, profession, or employment, Defendant Kessler made material statements of fact to Itron that were untrue, and failed to provide material facts he had a duty to provide. Mr. Kessler failed to exercise ordinary care in his collection of material information and failed to exercise ordinary care in relaying that information to Itron. Itron relied upon Mr. Kessler's misrepresentations and omissions, and Itron's reliance was reasonable. These misrepresentations and omissions caused material harm to Itron, as alleged more specifically below.

101.    Mr. Kessler was under a legal duty to provide truthful and accurate information regarding SmartSynch's business to Itron in the days leading up to the merger. Mr. Kessler's involvement in the execution of the Consert Agreement gave rise to a duty to know its contents and accurately disclose those to Itron. In particular, Mr. Kessler communicated with one or more persons employed by Itron and made representations to that person or persons with respect to the Consert Agreement prior to the execution of the Consert Agreement, and thus had an obligation to correct any misrepresentation he made in conjunction with those communications. Mr. Kessler's role in the merger process was such that Mr. Kessler was obliged to discover the existence and material terms of the Consert Agreement and to inform SmartSynch of the same. Itron was entitled to rely on Mr. Kessler's non-negligent performance of that role, and thus to rely on the accuracy and completeness of his statements.

102.    Mr. Kessler was the representative of SmartSynch responsible for negotiating the Consert Agreement. He reasonably should have known all material terms of the Consert Agreement, and had a duty to accurately convey that information to Itron.

103.   On information and belief, Mr. Kessler represented to Itron that the Consert Agreement had not been executed. That representation was true when made, but later became untrue, giving Mr. Kessler an obligation to inform Itron of that change.

104.   On information and belief, Mr. Kessler represented to Itron that the Consert Agreement did not require a financial commitment of more than $100,000. That representation was not true when made, or else became untrue prior to the consummation of the Consert Agreement, giving rise to Mr. Kessler's obligation to correct his previous misrepresentation.

105.   On information and belief, Mr. Kessler represented to Itron that the Consert Agreement was part of the normal course of business of SmartSynch consistent with past practice. That representation was not true when made, or else became untrue prior to the consummation of the Consert Agreement, giving rise to Mr. Kessler's obligation to correct his previous misrepresentation.

106.   Itron relied on Mr. Kessler's representations with respect to the Consert Agreement. At and around the time of the Merger, it was reasonable for Itron to rely on Mr. Kessler's representations regarding the Consert Agreement.

107.   But for Mr. Kessler's negligent misrepresentations and omissions with respect to the Consert Agreement, Itron would have explicitly refused permission for SmartSynch to execute the Consert Agreement, and would not have consummated the Merger with SmartSynch under the terms as stated in the Merger Agreement. As a direct and proximate result of Defendant Kessler's negligent misrepresentations and omissions, Itron lost the opportunity to seek an adjustment of the Merger Consideration, or to seek a cancellation of (or otherwise address) the Consert Agreement prior to the merger.

108.    In addition, Mr. Kessler played an active role in coordinating with Itron in preparation for the merger. Mr. Kessler represented SmartSynch to Itron. Mr. Kessler was tasked with leading the integration team for product management and product marketing, and as such was obliged to relay complete and truthful information with respect to SmartSynch products, product marketing, and product management—including the changes contemplated by the Consert Agreement. Mr. Kessler regularly made representations and provided updates with respect to the status of SmartSynch as it related to the Merger Agreement. In the course of these representations, Mr. Kessler unknowingly relayed false, incomplete, and/or misleading information that gave rise to a duty to correct those statements by providing truthful information.

109.    On or after April 25, 2012 and on or before May 1, 2012—prior to the consummation of the Merger Agreement and merging of SmartSynch into Itron, and after he should have obtained knowledge of the existence and terms of the Consert Agreement—Mr. Kessler created, executed, or delivered (or caused to be created, executed or delivered) documents required for Itron to be obliged to consummate the Merger.

110.    At no time prior to the merger on May 1, 2012 did Defendant Kessler ever obtain Itron's approval to execute the Consert Agreement.

111.    At no time prior to the merger on May 1, 2012 did Defendant Kessler notify anyone at Itron about the existence of the Consert Agreement, or that it had been executed by SmartSynch.

112.    Mr. Kessler's duties as Vice President of Product Marketing of SmartSynch were such that he reasonably should have been informed of the existence and material terms of the Consert Agreement. Mr. Kessler bears responsibility for any failure by him to inform Mr.

Johnston and Mr. Habbu of the material terms of the Consert Agreement prior to consummation of SmartSynch's merger with Itron.

113.    Mr. Kessler negligently breached his duty to discover and relay accurate information regarding the Consert Agreement. Mr. Johnston's negligent acts include at least failing to read and understand the agreement about which he made representations inducing Itron to close the Merger, failing to inquire into the basis of representations made by him with respect to the agreement and/or failing to correct his own previous statements that later came to be untrue.

114.    But for Mr. Kessler's failure to disclose the nature and existence of the Consert Agreement, Itron would not have consummated the Merger with SmartSynch under the terms as stated in the Merger Agreement. As a direct and proximate result of Defendant Kessler's negligent misrepresentations and omissions, Itron lost the opportunity to seek an adjustment of the Merger Consideration, or to seek a cancellation of (or otherwise address) the Consert Agreement prior to the Merger Closing.

115.    Instead, Itron closed the merger and unwittingly assumed liability for the Consert Agreement. This resulted in substantial losses to Itron, due to the Consert Litigation and the resulting settlement.

**PRAYER FOR RELIEF**

116.    Wherefore, Plaintiff Itron respectfully requests that this Court enter judgment in its favor and against each of Defendants as follows:

A.    Holding that Stephen D. Johnston is liable for his negligent misrepresentations to Itron;

B.   Holding that Ajit Habbu is liable for his negligent misrepresentations to Itron;

C.   Holding that Gary Kessler is liable for his negligent misrepresentations to Itron;

D.   Awarding Itron all recoverable damages, the amount of which will be proven at trial;

E.   Awarding Itron costs, fees, and expenses, including reasonable attorneys' fees; and

F.   Such other and additional relief or remedy as the Court may deem just and appropriate or as may be available under applicable law.

## REQUEST FOR A JURY TRIAL

Itron hereby requests a trial by jury in connection with any claim and on any issues triable by jury.

Dated: April 29, 2015                    Respectfully Submitted:

Michael D. Simmons, MSB No. 9828
Donna M. Meehan, MSB No. 100484
**COSMICH SIMMONS & BROWN, PLLC**
101 S. Congress St. (39201)
P.O. Box 22626
Jackson, MS 39225-2626
T: (601) 863-2100
F: (601) 863-0078
E: mike@cs-law.com
E: donna@cs-law.com

*Counsel for Plaintiff Itron, Inc.*